# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 49632

SOUTH VALLEY GROUND WATER
DISTRICT and GALENA GROUND
WATER DISTRICT,

  Petitioners-Respondents-
  Cross Appellants,

v.

THE IDAHO DEPARTMENT OF
WATER RESOURCES and GARY
SPACKMAN in his official capacity
as Director of the Idaho Department
of Water Resources,

  Respondents-Appellants-
  Cross Respondents,

and

SUN VALLEY COMPANY, CITY
OF BELLEVUE, CITY OF
POCATELLO, CITY OF KETCHUM,
and CITY OF HAILEY,

  Intervenors-Respondents,

and

BIG WOOD CANAL COMPANY, and
BIG WOOD & LITTLE WOOD
WATER USERS ASSOCIATION,

  Intervenors-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Twin Falls, August 2023 Term

Opinion filed: January 12, 2024

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fifth Judicial District of the State of Idaho,
Blaine County. Eric J. Wildman, District Judge.

The decision of the district court is <u>affirmed in part</u> and <u>reversed in part</u>.

Raúl R. Labrador, Idaho Attorney General, Boise, for Appellants-Cross Respondents Idaho Department of Water Resources and Gary Spackman. Michael Orr argued. Garrick Baxter appearing only.

Barker Rosholt & Simpson, LLP, Boise, and Lawson Laski Clark, PLLC, jointly for Respondents-Cross Appellants South Valley Ground Water District and Galena Ground Water District. Albert P. Barker argued. Heather O'Leary appearing only.

Givens Pursley, LLP, Boise, for Intervenor-Respondent City of Hailey and Amicus Curiae for Municipal Providers. Michael Lawrence appeared but did not argue.

McHugh Bromley, PLLC, Boise, for Intervenor-Respondent Sun Valley Company and Amicus Curiae for Municipal Providers. Chris Bromley appeared but did not argue.

Rigby, Andrus & Rigby Law, PLLC, Rexburg, and Fletcher Law Office jointly for Intervenors-Appellants Big Wood and Little Wood Water Users Association and Big Wood Canal Company. W. Kent Fletcher argued.

Racine Olson, PLLP, Pocatello, for Amicus Curiae Idaho Ground Water Appropriators, Inc.

BEVAN, Chief Justice.

This appeal stems from a district court decision involving the adjudication of water rights in the Wood River Valley. Anticipating an unprecedented drought in 2021, the director of the Idaho Department of Water Resources ("the Director") commenced an administrative proceeding under Idaho Code section 42-237a.g. to determine whether water was "available to fill" junior groundwater rights in the aquifer beneath the Bellevue Triangle, the primary source of water on Silver Creek and the Little Wood River. After a six-day hearing, the Director issued a Final Order that found water was unavailable to fill the junior rights because pumping from the aquifer was affecting the use of senior surface water rights in violation of Idaho's prior appropriation doctrine. South Valley Ground Water District and Galena Ground Water District ("the Districts") petitioned for judicial review. The district court affirmed the Director's authority to initiate administrative proceedings in times of shortage under section 42-237a.g., but set aside the Director's Final Order after concluding it did not comply with Idaho's prior appropriation doctrine because the Director had not (a) formally designated an area of common groundwater supply, or (b) determined "material injury" had been sustained by senior surface water rights holders.

The Idaho Department of Water Resources ("IDWR") now appeals the district court's decision to this Court, arguing the Director complied with the prior appropriation doctrine by: (1) finding injury to surface water users under the statutory test for curtailment, and (2) faithfully applying the prior appropriation doctrine's longstanding presumptions, burdens, and evidentiary standards. The Districts filed a cross-appeal, challenging the district court's determination that the Director had authority to initiate proceedings under Idaho Code section 42-237a.g. For the reasons set forth below, we affirm in part and reverse in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

A central focus of the case before us is the relationship between groundwater in the Bellevue Triangle and surface water flowing in Silver Creek and the Little Wood River. The Bellevue Triangle is a portion of the Wood River Valley located south of Bellevue. The triangle's boundary points are roughly located at Bellevue in the north, Stanton Crossing (where Highway 20 crosses the Big Wood River) in the southwest, and Picabo, Idaho, in the southeast. The Bellevue Triangle is located in Water District 37.

### WATER DEVELOPMENT AND WATER RIGHTS IN THE WOOD RIVER VALLEY

The earliest surface water rights in the Wood River Valley date back to the 1870s and 1880s. These include surface water rights authorizing diversion and beneficial use from Silver Creek and the Little Wood River. In a normal or average water year, surface water rights with a priority date of 1883 or earlier are deliverable for the entire irrigation season. In a normal or average water year, surface water rights with a priority date of 1884 are deliverable until mid-to-late July.

Groundwater rights in the Bellevue Triangle are junior to the surface rights in the area. Water users began appropriating groundwater rights in the Bellevue Triangle around 1930, and most of those rights have priority dates later than 1940. The advent of modern drilling technology, rural electrification, and efficient pumps brought a steadily increasing number of groundwater appropriations until the early 1990s.

Starting in 1991, IDWR completed a series of regulatory actions to address the impact of groundwater diversions on both surface and groundwater sources in the Wood River Basin. In June 1991, former Director Keith Higginson issued an order designating the Big Wood River Ground Water Management Area ("Big Wood GWMA"), based in part on findings that "surface and

3

ground waters of the Big Wood River drainage are interconnected" and the "[d]iversion of ground water from wells can deplete surface water flow in streams and rivers." IDWR stated in this order that it would not approve new applications for consumptive use unless there was a showing that the new use would not injure existing water rights. Approvals of new applications for consumptive groundwater use largely stopped after that order.

In 1994, IDWR promulgated Rules for Conjunctive Management of Surface and Ground Water Resources ("CM Rules") to establish procedures for responding to delivery calls "made by the holder of a senior-priority surface or ground water right against the holder of a junior-priority ground water right in an area having a common ground water supply." IDAPA 37.03.11.001; *See Am. Falls Reservoir Dist. No. 2 v. Idaho Dep't of Water Res.*, 143 Idaho 862, 867, 154 P.3d 433, 438 (2007) ("*AFRD #2*") (discussing the history and purpose of the CM Rules).

During the Snake River Basin Adjudication ("SRBA"), surface and groundwater rights were decreed in Water District 37 between 2005 and 2010. In 2013, IDWR issued an order revising the boundaries of Water District 37. The order made two important changes. First, it combined water districts for the Big Wood River, the Little Wood River, and Silver Creek. Second, it added groundwater rights from the Upper Big Wood River Valley above Magic Reservoir and the Silver Creek drainage to Water District 37. Water District 37 is now known as the Big and Little Wood River Drainages.

In 2015, senior surface water users Big Wood & Little Wood Water Users Association ("Association"), located in Water District 37, filed the first conjunctive management delivery call in this district, but it was dismissed on procedural grounds. *Sun Valley v. Spackman*, No. CV-WA-2015-14500 (Ada Cnty. Dist. Ct. April 22, 2016). The primary issue was whether the delivery call should have been made under CM Rule 40 (detailing requirements for senior delivery calls in areas with an established common groundwater supply in an organized water district) or CM Rule 30 (detailing requirements for senior delivery calls in areas outside an organized water district). The Director found the seniors' calls were governed by CM Rule 40 and denied Sun Valley's motion to dismiss the case.

On petition for judicial review, the district court analyzed CM Rule 40 and CM Rule 30, and concluded that Rule 40 did not apply because an area of common groundwater supply had not been designated in Water District 37. Because no area of common groundwater supply had been designated, the district court found IDWR was required to process the delivery call under CM Rule

4

30. However, the district court also concluded that CM Rule 30's requirements had not been met because the seniors had not identified an area of common groundwater supply. The district court found that an area of common groundwater supply is a prerequisite for delivery calls made under either CM Rule 30 or 40.

In 2017, the Association filed a second delivery call that was also dismissed on procedural grounds. The Director dismissed that petition after concluding the Association did not have standing to file a delivery call on behalf of individual water right holders. *Order Dismissing Petition for Administration*, No. DC-2017-001 (IDWR June 7, 2017). The Director's decision was not appealed.

Before and after these delivery calls were brought, between March 2013 and January 2019, twenty-two Modeling Technical Advisory Committee ("MTAC") meetings were convened to facilitate data collection and the construction and calibration of a groundwater model. With input from the MTAC, these meetings resulted in the development of the Wood River Valley Aquifer Model Version 1.1 ("the WRV Aquifer Model") to serve as a tool for water rights administration and water resource management and planning. A final report documenting the present version of the WRV Aquifer Model was published in 2019 and stated that the Model reflects the best knowledge of the aquifer system available at the time and that the calibration statistics provide confidence that the Model provides an acceptable representation of the Wood River Valley hydrologic system:

> Although every groundwater model is a simplification of a complex hydrologic system, WRV Aquifer Model Version 1.1 is the best available tool for evaluating the interaction between groundwater and surface water in the Wood River Valley. The science underlying the production and calibration of the WRV Aquifer Model Version 1.1 reflects the best knowledge of the aquifer system available at this time. The WRV Aquifer Model Version 1.1 was calibrated to 1,314 aquifer water-level measurements and 1,026 river gain-and loss calculations. Calibration statistics indicate a good fit to the observed data, providing confidence that the updated model provides an acceptable representation of the hydrologic system in the Wood River Valley.

### 2021 DROUGHT YEAR

The Wood River Valley faced unprecedented drought and water scarcity in 2021. The Surface Water Supply Index ("SWSI") is a predictive indicator of surface water availability in a river basin compared to historic supply. There is a strong correlation between the SWSI for the Big Wood River above Hailey and the flows in Silver Creek. The April SWSI predicted inadequate

water supply across Water District 37. The SWSI for June through September was worse than any of the previous 30 years—a value of -4.0 on an index ranging from +4.1 (extremely wet) to -4.1 (extremely dry).

IDWR used the WRV Aquifer Model to simulate the effect of curtailing groundwater for agricultural, municipal, residential, commercial, and irrigation uses during the 2021 irrigation season. Curtailment was simulated within two areas. The first scenario analyzed water rights curtailment throughout the Model's entire boundary, which follows the narrow Wood River Valley beginning north of Sun Valley, extending through Bellevue, and ending in the south near Picabo. The second scenario analyzed water rights curtailment in a smaller area, roughly corresponding to the Bellevue Triangle.

One of the WRV Aquifer Model's developers, Jennifer Sukow, summarized the results of these two curtailment analyses in a memorandum included as part of the record. Sukow determined that curtailing groundwater rights in only the Bellevue Triangle would provide senior surface water users with "99% of the predicted in-season benefit to Silver Creek." Nearly all the benefits predicted in the first scenario could be achieved by limiting curtailment to the Bellevue Triangle. The Bellevue Triangle constitutes 70% of the consumptive groundwater use in the Model's boundary, meaning that nearly identical benefits could be achieved by curtailing 30% less consumptive groundwater use in that area. The Bellevue Triangle curtailment area also had the advantage of focusing the predicted benefits on Silver Creek by excluding pumping that predominantly impacts flow in the Big Wood River or underflow to the Eastern Snake Plain Aquifer ("ESPA"). The WRV Aquifer Model also predicted that curtailing the Bellevue Triangle would yield substantial additional flow to Silver Creek during the 2021 irrigation season—22.7 cubic feet per second ("cfs") on average in July, 28 cfs in August, and 26.5 cfs in September.

The groundwater districts proposed pumping reductions and other mitigation strategies at the April 7, 2015, Big Wood GWMA meeting to address the anticipated shortfalls identified by IDWR. After hearing those proposals, the Director stated the mitigation proposals were "either inadequate or unreasonable." At that meeting, the Director also said he was "exploring all options, consistent with the prior appropriation doctrine" to protect senior water right users, and that he "may move forward with administrative actions."

The groundwater districts offered increased mitigation proposals at the following Big Wood GWMA meeting on April 15, 2021. After discussing those proposals and explaining that

6

the need for mitigation varies by location, the Director stated in that meeting that he was "ready to act" and warned that "some groundwater users could be required to reduce their pumping much more than the amounts that have been proposed by the groundwater districts."

**B. Procedural Background.**

On May 4, 2021, the Director issued a Notice of Administrative Proceeding, Pre-Hearing Conference, and Hearing ("the Notice"). The Notice informed all water users in Water District 37 (Big and Little Wood River Basin, including Silver Creek) and adjacent Water District 37B (Camas Creek Basin) that a drought was predicted for the 2021 irrigation season and the water supply in Silver Creek and its tributaries could be inadequate to meet the needs of surface water users. Based on the analyses from the two WRV Aquifer Model curtailment scenarios, the Director determined that pumping water from groundwater wells in the Bellevue Triangle would "affect the use" of senior surface water rights on Silver Creek and its tributaries during the 2021 irrigation season. Accordingly, the Director announced he was commencing proceedings under Idaho Code section 42-237a.g.'s provision that "water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect the present or future use of any prior surface or ground water right." The Director's Notice stated that groundwater rights could be curtailed for the 2021 irrigation season. The Director warned all water users: "If you do not participate, you may still be legally bound by the results of this proceeding."

IDWR published the Notice in several newspapers and mailed the Notice to all ground and surface water right holders in Water District 37 and Water District 37B. The Notice directed those persons wishing to participate in the proceeding to submit notice by May 19, 2021. The Notice scheduled a pre-hearing conference for May 24, 2021, and a hearing for June 7–11, 2021, at IDWR's state office. Many parties filed notices of intent to participate in the administrative proceedings.

On May 11, 2021, the Director issued a Request for Staff Memorandum ("the Request"). The Request described ten subjects to be addressed by IDWR staff in separate memoranda and directed that the memoranda be submitted to the Director on or before May 17, 2021. Four staff memoranda responding to the Request were submitted to the Director on the deadline and posted on IDWR's website the next day. The staff memoranda included Sean Vincent's Surface Water Supply Index ("SWSI") analysis; Tim Luke's analysis of historical priority administration in Water District 37 and potential injury to surface water rights; and Jennifer Sukow's analysis of

Wood River Valley hydrology, hydrogeology, groundwater use, and the results of the WRV Aquifer Model curtailment scenarios.

Parties filed prehearing motions, including two motions to dismiss the proceeding, a motion to appoint an independent hearing officer, motions to continue or postpone the hearing, and a motion to authorize discovery. The Director granted the motion to authorize discovery but denied the other motions. After limited discovery, the Director held a six-day hearing from June 7–12, 2021. The Director admitted exhibits into evidence and took testimony. He also allowed the parties to submit post-hearing briefing. The Districts then filed a proposed mitigation plan on June 24, 2021.

The Director issued a Final Order on June 28, 2021, and denied the proposed mitigation plan on June 29, 2021, without a hearing. The Director concluded that "consumptive ground water pumping in the Bellevue Triangle for purposes other than domestic and stock watering uses . . . should be curtailed as soon as possible in order to protect senior surface water rights diverting from Silver Creek and the Little Wood River." Rather than designating an area of common groundwater supply, the Final Order explained that the Director had analyzed a "potential area of curtailment" (i.e., the Bellevue Triangle) which showed that groundwater pumping in that area would impact senior surface water rights on Silver Creek and its tributaries. The Final Order curtailed over 300 groundwater rights for the 2021 irrigation season commencing July 1, 2021. The curtailment lasted eight days, ending when the Director approved an amended mitigation plan on July 8, 2021.

The Districts petitioned for judicial review, with the case assigned to the Snake River Basin Adjudication ("SRBA") district court judge. Following oral argument in January 2022, the district court issued its Memorandum Decision and Order on February 10, 2022. The district court: (1) affirmed that the Director had the authority to initiate the administrative proceeding under Idaho Code section 42-237a.g.; (2) concluded that IDWR's CM Rules did not limit or supersede the Director's statutory authority in the proceeding; but (3) determined that the Final Order did not comply with the prior appropriation doctrine because it did not (a) formally designate an "area of common ground water supply" and (b) "conjunctively administer to material injury" as defined in the CM Rules. The district court also concluded that the Final Order prejudiced the Districts' substantial rights.

8

IDWR appealed the district court's decision that the Director's Final Order violated the prior appropriation doctrine. The Districts cross-appealed, challenging the district court's determination that the Director could initiate proceedings under Idaho Code section 42-237a.g.

## II. QUESTIONS PRESENTED ON APPEAL

1. Did the district court err in finding the Director had authority to initiate administrative proceedings to conjunctively administer interconnected ground and surface water rights in times of shortage under Idaho Code section 42-237a.g.?

2. Did the district court err in concluding the CM Rules do not apply to proceedings initiated under Idaho Code section 42-237a.g.?

3. Did the district court err in concluding the Director's Final Order was inconsistent with the prior appropriation doctrine?

4. Did the proceedings initiated by the Director under Idaho Code section 42-237a.g. violate the Districts' due process rights?

5. Are the Districts, the City of Hailey, or Sun Valley Company entitled to an award of attorney fees on appeal?

## III. STANDARDS OF REVIEW

The Idaho Administrative Procedure Act, chapter 52, title 67, Idaho Code, governs judicial review of the Director's final orders. I.C. § 42-1701A(4). A reviewing court must affirm the agency action unless the agency's findings, inferences, conclusions, or decisions are

> (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) not supported by substantial evidence on the record as a whole; or (e) arbitrary, capricious, or an abuse of discretion.

I.C. § 67-5279(3). Further, the petitioner must show that one of its substantial rights has been prejudiced. I.C. § 67-5279(4). This Court reviews the agency's record independently to determine whether the district court correctly decided the issues presented to it. *Rangen, Inc. v. IDWR*, 159 Idaho 798, 804, 367, P.3d 193, 199 (2016).

The Court freely reviews questions of law. *Id*. However, the "agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *A&B v. IDWR*, 153 Idaho 500, 506. 284 P.3d 225, 231 (2012). "Substantial evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Rangen*, 159 Idaho at 804, 367 P.2d at 199 (cleaned up).

9

This appeal concerns the conjunctive administration of interconnected ground and surface water rights during a drought. Although conjunctive administration has occurred under the CM Rules since 1994, the Director did not use the CM Rules in this case. Instead, the Director acted under Idaho Code section 42-237a.g. to curtail junior groundwater rights in favor of senior surface water rights. That code section, which is part of Idaho's Ground Water Act, has not previously been used for this purpose. The district court held that the Director had authority to initiate administrative proceedings under section 42-237a.g. but set aside the Director's Final Order after concluding it did not comply with Idaho's prior appropriation doctrine.

IDWR filed the original appeal, challenging the district court's holding that the Director's Final Order failed to comply with the prior appropriation doctrine. Big Wood & Little Wood Water Users Association and Big Wood Canal Company, senior surface water users (referred to hereafter as "Seniors"), intervened and filed a brief in support of IDWR's position. The Districts cross-appealed, challenging the district court's determinations that: (1) the Director had authority to initiate proceedings under section 42-237a.g., and (2) the CM Rules did not apply. Sun Valley Company and the City of Hailey, both junior groundwater users, intervened and filed briefs in support of the Districts' positions. Veolia Water Idaho, Inc., the City of Coeur d'Alene ("Municipal Providers"), and the Idaho Ground Water Appropriators, Inc. ("IGWA"), also submitted amicus briefs in support of the Districts' position.

**A. Idaho Code section 42-237a.g. grants the Director authority to initiate proceedings to conjunctively administer interconnected ground and surface water rights in times of shortage.**

As a threshold issue, the district court concluded that Idaho Code section 42-237a.g. gave the Director authority to initiate administrative proceedings to conjunctively administer interconnected ground and surface water rights in times of shortage when no adverse claim (i.e., delivery call) has been made. We hold that section 42-237a.g.'s plain language unambiguously grants the Director discretionary power to regulate the withdrawal of water from "any well" that affects senior rights, regardless of whether the well is located inside or outside an organized water district. This authority ensures the Director has meaningful management and control of the distribution of water from all natural water sources. It also operates independently of the CM Rules' procedures for delivery calls initiated by water users. Section 42-237a.g. serves as a critical

10

administrative backstop when water is scarce but individual water users cannot or have not filed delivery calls under the CM Rules.

Idaho's Ground Water Act was enacted by the legislature in 1951. The Act states that it is the Director's duty "to control the appropriation and use of the ground water of this state as in this act provided. . . ." I.C. § 42-231. Section 42-237a.g. grants the Director the power to initiate administrative proceedings to administer groundwater rights under certain circumstances:

> a. In the administration and enforcement of this act and in the effectuation of the policy of this state to conserve its ground water resources, the director of the department of water resources in his sole discretion, is empowered:
>
> . . . .
>
> > g. To supervise and control the exercise and administration of all rights to the use of ground waters and in the exercise of this discretionary power he may initiate administrative proceedings to prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available. To assist the director of the department of water resources in the administration and enforcement of this act, and in making determinations upon which said orders shall be based, he may establish a ground water pumping level or levels in an area or areas having a common ground water supply as determined by him as hereinafter provided. Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surface or ground water right or result in the withdrawing of the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge. . . .
> >
> > . . . .
> >
> > In connection with his supervision and control of the exercise of ground water rights the director of the department of water resources shall also have the power to determine what areas of the state have a common ground water supply and whenever it is determined that any area has a ground water supply which affects the flow of water in any stream or streams in an organized water district, to incorporate such area in said water district; and whenever it is determined that the ground water in an area having a common ground water supply does not affect the flow of water in any stream in an organized water district, to incorporate such area in a separate water district to be created in the same manner provided for in section 42-604 of title 42, Idaho Code. The administration of water rights within water districts created or enlarged pursuant to this act shall be carried out in accordance with the provisions of title 42, Idaho Code, as the same have been or may hereafter be amended, except that in the administration of ground water rights either the director of the department of water resources or the watermaster in a water district or the director of the department of water

11

resources outside of a water district shall, upon determining that there is not sufficient water in a well to fill a particular ground water right therein by order, limit or prohibit further withdrawals of water under such right as hereinabove provided, and post a copy of said order at the place where such water is withdrawn; provided, that land, not irrigated with underground water, shall not be subject to any allotment, charge, assessment, levy, or budget for, or in connection with, the distribution or delivery of water.

I.C. § 42-237a.g.

The district court determined that the language of Idaho Code section 42-237a.g. is clear: it empowers the Director to initiate administrative proceedings to prohibit or limit the withdrawal of water from a well when "water to fill any water right in [that] well is not… available." Citing this Court's decision in *Clear Springs Foods, Inc. v. Spackman*, 150 Idaho 790, 252 P.3d 71 (2011), the district court determined water may be deemed unavailable to fill a groundwater right in two scenarios: (1) when groundwater withdrawal would cause material injury to a senior water right, or (2) when groundwater withdrawal would exceed the natural recharge of the groundwater source.[1]

The district court also found that, under the first scenario, the Director may initiate an administrative proceeding under section 42-237a.g. to curtail a junior groundwater right in favor of a materially injured senior surface water right. Although the Director had not used section 42-237a.g. before, the district court concluded that the Director had the discretion to act under section 42-237a.g. and properly did so. The district court noted that, while the use of the statute was "unprecedented in this State's history," section 42-237a.g. is "still a tool for the Director to carry out his duties under the Ground Water Act" in cases where no adverse claim has been made.

Despite this straightforward conclusion, the district court also looked to legislative changes to section 42-237 that occurred in 2021 in its analysis. The district court noted that the legislature repealed a part of section 42-237 that gave an adversely affected water user "authority to request conjunctive administration" by filing a delivery claim "against another water user with the Director." *See* Idaho Code § 42-237b.–d. (repealed 2021). As the district court recognized, the legislature altered that option when it repealed those sections of the Idaho Code. In the act

---

[1] The Director did not find that the Bellevue Triangle wells would have withdrawn water in 2021 at a rate that exceeds the anticipated rate of future natural recharge. Therefore, the second scenario described in *Clear Springs* is not at issue.

repeating this language, the legislature recognized that these sections of the Ground Water Act had become obsolete given the promulgation of the CM Rules:

> Consistent with the Governor's Red Tape Reduction Act, this bill seeks to eliminate inactive provisions of the law. The legislation eliminates outdated and obsolete sections of Idaho Code related to water right delivery calls. The procedures outlined in these sections are obsolete since the adoption of the Rules for Conjunctive Management of Surface and Ground Water Resources.

Statement of Purpose, RS 28076 H.B. No. 43 (2021). Thus, what was once a two-pronged administrative scheme under the Act is now a single option method. The district court found that water users had not lost the ability to request conjunctive administration by filing an adverse claim with IDWR, but such a request must now occur under the CM Rules rather than the Ground Water Act.

We hold that the district court correctly recognized that Idaho law establishes two paths for conjunctive administration: one when a water user makes a delivery call against one or more groundwater rights users under the CM Rules, and the other when the Director exercises his discretion under section 42-237a.g. to limit or prohibit the withdrawal of water from "any well." The district court was further correct in concluding that the Director was within his statutory authority to proceed as he did here.

A closer look at the history of Idaho Code section 42-237a.g. buttresses this analysis. Section 42-237a.g. originated in the 1953 amendments to the Ground Water Act. Then, as now, the statute authorized the Director[2] to "prohibit or limit the withdrawal of water from *any well*" whenever he determines water is "not *there* available" (emphasis added):

> Section 15. POWERS OF THE STATE RECLAMATION ENGINEER. – In the administration and enforcement of this act and in the effectuation of the policy of this state to conserve its ground water resources, the state reclamation engineer is empowered:
>
> > g. To supervise and control the exercise and administration of all rights hereafter acquired to the use of ground waters and in the exercise of this power he may by summary order, prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available. To assist the state reclamation engineer in the administration and enforcement of this act, and in making determinations upon which said orders shall be based, he may establish a ground water pumping level or levels in an area or areas having a common

---

[2] The Director was formerly titled the State Reclamation Engineer.

13

ground water supply as determined by him as hereinafter provided. Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surf ace or ground water right or result in the withdrawing the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge.

1953 Idaho Sess. Laws ch. 182, § 15.

In 1994, the legislature amended Idaho Code section 42-237a.g. to add the discretionary power to initiate proceedings "[t]o supervise and control the exercise and administration of all rights to the use of ground waters and in the exercise of this discretionary power he may initiate administrative proceedings to prohibit or limit the withdrawal of water from any well. . . ." 1994 Idaho Sess. Laws ch. 450, Water Resources—Department Director Powers—Distribution (H.B. 986). The Statement of Purpose explained that the 1994 amendments were intended to clarify the limitations on the use of a writ of mandamus to force the curtailment of water, by giving the Director discretionary authority to administer water outside of organized districts:

In 1992, the Idaho Legislature enacted changes to Idaho Code § 42-602. Those changes have been interpreted by the Idaho Supreme Court as imposing a duty upon the Director to supervise and control the distribution of water outside the boundaries of an organized water district even though the rights to that water have not been adjudicated and there are unresolved legal questions regarding the relationship of the water rights sought to be distributed. This was not the intent of the 1992 amendments. . . .

. . . The purpose of this Act is to restore the law relative to distribution of water back to what it was prior to the 1992 amendments to Idaho Code § 42-602 and to make clear that the Director shall not be subject to a writ of mandate when called upon to distribute water, specifically, the Act clarifies that Chapter 6 of Title 42, Idaho Code is only applicable to distribution of water within a duly formed water district. Water users seeking to make a call for distribution outside a water district may elect to proceed directly against the owner of the water right claimed to be causing injury or may request the director to exercise authority under other chapters of title 42, Idaho Code. This Act, however, makes clear that the Director's authority to distribute water outside a water district is a discretionary function. The director shall have discretion to not shut or fasten any headgate or other facility for the diversion of water pursuant to a water right outside a water district if the director determines that the legal status of the water right or the legal or hydrologic relationship of the water right to one or more other water rights, must first be adjudicated by a court. . . .

Statement of Purpose, H.B. 986, 52nd Legis., 2nd Reg. Sess. (1994).

14

Based on this language, the Districts argue that the Director's authority was limited to initiating proceedings for water outside of water districts. But we hold that the district court's interpretation of the Director's authority to initiate proceedings under Idaho Code section 42-237a.g. is correct. Although the 1994 amendments provided the Director discretionary authority to administer water "outside of organized districts," the statute anticipates that orders restricting well withdrawals may be issued "either . . . in a water district or . . . outside of a water district." I.C. § 42-237a.g. If, as the Districts claim, section 42-237a.g. is limited to wells outside a water district, the statute's instructions for officials "in a water district" would be pointless surplusage. *See Potlatch Corp. v. United States*, 134 Idaho 912, 915, 12 P.3d 1256, 1259 (2000) ("Standard rules of statutory interpretation require this Court to give effect to the legislature's intent and purpose, and to every word and phrase employed."). The Districts' inside/outside distinction is not persuasive because section 42-237a.g. unambiguously provides the Director authority to administer "any well" regardless of whether the well is located inside or outside a water district.

The district court's conclusion that the Ground Water Act contemplated one scenario for when an adverse claim had been filed, and one for when it had not, is also bolstered by the legislature's 2021 repeal of Idaho Code sections 42-237b.–d. due to the promulgation of the CM Rules. As the district court explained, this repeal changed a water user's ability to request conjunctive administration, transforming what was once a two-pronged administrative scheme under the Act to a single option scheme. Even so, water users can still request conjunctive administration by filing an adverse claim with IDWR, but that request must occur under the CM Rules rather than the Ground Water Act. Moreover, as noted above, the Seniors had tried and failed to make a delivery call under the CM Rules in 2015, and in 2017. Because no area of common groundwater has been established for Water District 37 (as required by those rules), they had no recourse under those rules as the 2021 drought began to materialize.

For these reasons, we affirm the district court's conclusion that the Director had authority to initiate proceedings under the Ground Water Act even though no adverse claim has been filed.

**B. The district court did not err in concluding the CM Rules did not apply.**

After the district court determined that the Director had the authority to initiate an administrative proceeding for purposes of conjunctive administration in times of shortage under the Ground Water Act, the district court considered whether the CM Rules limit or supersede that

authority. The district court reasoned that the CM Rules were not implicated because there was no adverse claim filed in this case.

The CM Rules are an important tool for resolving disputes over rights to interconnected surface and groundwater. However, we hold that the district court correctly concluded that the CM Rules are limited to situations in which an adverse claim has been made.

The CM Rules were promulgated by IDWR in 1994. Rule 1 defines the scope of the CM Rules as follows:

> 001. TITLE AND SCOPE: These rules may be cited as "Rules for Conjunctive Management of Surface and Ground Water Resources." The rules *prescribe procedures for responding to a delivery call made by the holder of a senior-priority surface or ground water right* against the holder of a junior-priority ground water right in an area having a common ground water supply. It is intended that these rules be incorporated into general rules governing water distribution in Idaho when such rules are adopted subsequently.

IDAPA 37.03.11.001 (emphasis added). The district court determined that under the plain language of CM Rule 1, the CM Rules are limited in scope to prescribing the basis and procedure for responding to delivery calls made by the holder of a senior surface or groundwater right against the holder of a junior groundwater right in an area having a common groundwater supply. Thus, the district court found the CM Rules are limited to scenarios in which an adverse claim has been made by one water user against another, and the Director's authority to initiate proceedings under the Ground Water Act is not limited or superseded by the CM Rules when a delivery call has not occurred. The district court is correct.

This conclusion is bolstered by two more factors. First, CM Rule 2[3] makes clear the CM Rules do not limit the Director's authority under the Ground Water Act:

> 002. OTHER AUTHORITIES REMAIN APPLICABLE: Nothing in these rules limits the Director's authority to take alternative or additional actions relating to the management of water resources as provided by Idaho law.

IDAPA 37.03.11.002. Second, when the legislature repealed Idaho Code sections 42-237b.–d., stating that those sections had been superseded by the CM Rules, it left section 42-237a.g. intact. If the legislature had intended to circumvent the Director's authority to initiate proceedings under the Ground Water Act, it would have repealed section 42-237a.g. as well. Therefore, the

---

[3] At the time of the district court's order, this rule was numbered CM Rule 3. It has since been renumbered CM Rule 2.

promulgation of the CM Rules did not supersede the Director's authority to initiate proceedings for conjunctive management under the Ground Water Act. The CM Rules are implicated only when one water user makes an adverse claim against another: when the claimant makes a delivery call. The district court did not err when it concluded that the CM Rules did not apply because no delivery call had been made in this case.

The Districts contest this conclusion and assert that the CM Rules apply to all conjunctive administration of interconnected waters. We will address the Districts' arguments in turn.

### 1. General Applicability of CM Rules

The Districts claim that the Director erred by failing to harmonize title 42, chapter 2 (detailing the process for appropriation of water) and title 42, chapter 6 (setting out the duties of the Director and the watermaster regarding water distribution) in failing to construe and implement the Ground Water Act "in harmony with the provisions of title 42, Idaho Code." The Districts argue that the legislature intended that water districts—and the CM Rules—serve as the vehicle for efficient and proper conjunctive administration, not discretionary proceedings initiated by the Director.

In addressing this argument, this Court applies the following principles of statutory interpretation:

> The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*Pentico v. Idaho Comm'n for Reapportionment*, 169 Idaho 840, 844, 504 P.3d 376, 380 (2022) (quoting *Est. of Stahl v. Idaho State Tax Comm'n*, 162 Idaho 558, 562, 401 P.3d 136, 140 (2017)).

> However, "[i]f the language of the statute is capable of more than one reasonable construction it is ambiguous," and a statute that is ambiguous must be construed with legislative intent in mind, which is ascertained by examining "not only the literal words of the statute, but the reasonableness of the proposed interpretations, the policy behind the statute, and its legislative history."

*Id.* (quoting *BHC Intermountain Hosp., Inc. v. Ada Cnty.*, 150 Idaho 93, 95, 244 P.3d 237, 239 (2010)). "A statute is not ambiguous merely because the parties present differing interpretations."

*Id.* "Instead, the statute is ambiguous only if more than one of the interpretations can be reasonably construed from the language of the statute." *Id.*

The Districts claim that to apply these rules of statutory construction, the conjunctive administration of water rights under section 42-237a.g. should not be viewed in isolation. Instead, the statute must be read together with chapter 6, title 42, its implementing regulations, and the CM Rules, particularly when administering within a water district. While we do not disagree, we nonetheless reach a different conclusion than that advanced by the Districts.

The district court found the CM Rules were not implicated because CM Rule 1 specifies: "The rules prescribe procedures for responding to a delivery call made by the holder of a senior-priority surface or ground water right against the holder of a junior-priority ground water right in an area having a common ground water supply." IDAPA 37.03.11.001. CM Rule 2 reinforces CM Rule 1's express limitation to delivery calls: "Nothing in these rules limits the Director's authority to take alternative or additional actions relating to the water resources as provided by Idaho Law." IDAPA 37.03.11.002. This Court reached the same conclusion in 1997 when it stated the "[CM] Rules adopted by IDWR are primarily directed toward an instance when a 'call' is made by a senior water right holder." *A & B Irr. Dist.*, 131 Idaho at 422, 958 P.2d at 579.

Based on the plain language of these CM Rules and Idaho Code section 42-237a.g., we affirm the district court's conclusion that the Rules' application is limited to instances in which an adverse claim has been made. The CM rules do not override the clear statutory directive found in section 42-237a.g. CM Rule 2 anticipates and respects the Director's authority to begin proceedings "related to water resources as provided by Idaho Law." Section 42-237a.g. then authorizes the Director to "supervise and control the exercise and administration of all rights to the use of ground water." I.C. § 42-237a.g. Further,

> in the exercise of this discretionary power [the Director] may initiate administrative proceedings to prohibit or limit the withdrawal of water from any well during any period that [the Director] determines that water to fill any water right in said well is not there available. … Water in a well shall not be deemed available to fill a water right therein if withdrawal… of the amount called for by such right, would affect, contrary to the declared policy of [the Ground Water Act], the present or future use of any prior surface of ground water right. . . .

18

*Id.* Nothing in section 42-237a.g. requires the application of the CM Rules, which, as we have said, by their own definition only apply when a delivery call has occurred. IDAPA 37.03.11.001.[4]

Accordingly, we hold that the plain language of section 42-237a.g. expressly authorized the Director to institute this proceeding in the absence of a delivery call or a request for administration, and there is no affirmative requirement that the CM Rules apply in the absence of an adverse claim.

### 2. *The Seniors did not make a delivery call.*

Separately, the Districts dispute the Director's and the district court's determination that no delivery call had been made. The Districts point to the following facts as evidence that the Seniors made a delivery call under the CM Rules:

1) The Association members submitted letters to the Director in February 2015.

2) The Association filed a petition with IDWR in March 2017.

3) Seniors communicated their requests for administration and claims of injury to the Director at the advisory committee meetings held during the fall of 2020 through spring of 2021.

4) In October 2020, the Seniors conveyed a draft agreement proposing conjunctive administration of surface and groundwater in Water District 37[,] which was presented at the first advisory committee meeting on November 4, 2020, and reviewed again at the March 3, 2021 meeting.

5) In the January 2021 meeting, the Seniors' consultant stated that the water supply was a "zero sum game" and if water was used by pumping then it was unavailable for surface water users.

6) In February 2021, Tim Luke of IDWR asked for written explanations from the committee members about their goals.

7) Tim Luke reported to the advisory committee that the Seniors demanded curtailment of groundwater as required by the priority of their water rights. Luke summarized the demands of the Seniors as: "The seniority of surface

---

[4] CM Rule 20 provides a succinct summary of the CM Rules' scope, "responding to delivery calls":

> Rule 30 provides procedures for responding to delivery calls within areas having a common ground water supply that have not been incorporated into an existing or new water district or designated a ground water management area. Rule 40 provides procedures for responding to delivery calls within water districts where areas having a common ground water supply have been incorporated into the district or a new district has been created. Rule 41 provides procedures for responding to delivery calls within areas that have been designated as ground water management areas. Rule 50 designates specific known areas having a common ground water supply within the state.

IDAPA 37.03.11.020.07. The record does not demonstrate that any of the situations illustrated in CM Rule 20 exist in this case.

water rights is currently not being honored. i.e., *groundwater rights that are junior to surface rights should be curtailed accordingly.*"

    8) Discussion at the meetings included "curtailment by priority, conjunctive management."

(Emphasis added by the Districts.) The Districts allege there is no way to interpret these demands other than as requests for administration under the prior appropriation doctrine.

The CM Rules define a delivery call as a "request from the holder of a water right for administration of water rights under the prior appropriation doctrine." IDAPA 37.03.11.010.04. CM Rule 30 details the information that must be included in a delivery call petition when there is no established area of common groundwater supply:

01. Delivery Call (Petition). When a delivery call is made by the holder of a surface or ground water right (petitioner) alleging that by reason of diversion of water by the holders of one (1) or more junior-priority ground water rights (respondents) the petitioner is suffering material injury, *the petitioner shall file with the Director a petition in writing* containing, at least, the following in addition to the information required by IDAPA 37.01.01, "Rules of Procedure of the Department of Water Resources," Rule 230.

    a.  A description of the water rights of the petitioner including a listing of the decree, license, permit, claim or other documentation of such right, the water diversion and delivery system being used by petitioner and the beneficial use being made of the water.

    b.  The names, addresses and description of the water rights of the ground water users (respondents) who are alleged to be causing material injury to the rights of the petitioner in so far as such information is known by the petitioner or can be reasonably determined by a search of public records.

    c.  All information, measurements, data or study results available to the petitioner to support the claim of material injury.

    d.  A description of the area having a common ground water supply within which petitioner desires junior-priority ground water diversion and use to be regulated.

IDAPA 37.03.11.030.01 (emphasis added).

Here, the Districts assert that a delivery call had been made based on the Seniors' previous delivery calls, which were dismissed in 2015 and 2017. But those dismissed delivery call petitions do not establish that the Seniors filed a petition in 2021. Nor does any testimony presented in response to the Director's request for evidence in a proceeding he had initiated under the Ground Water Act suggest the Seniors made a delivery call *in 2021*. The Districts rely on comments made

during advisory committee meetings, specifically an IDWR employee's (Tim Luke) summary of generic demands the Seniors made. We disagree that such general discussions about injury constitute a delivery call as defined in the CM rules above.

The support the Districts rely on is a draft agreement between Seniors and Juniors that allegedly proposed conjunctive administration of surface and groundwater in Water District 37. But this proposed agreement is not in the record. The Districts asked this Court to either take judicial notice of this memorandum under Idaho Rule of Evidence 201(d), or to augment the record with a copy of the memorandum. We denied this request by the Districts because the draft agreement was not filed in district court as required by Idaho Appellate Rule 30(a). *Order Denying Motion to Augment*, No. 49632 (Idaho Supreme Court January 13, 2023). Thus, we do not consider this argument.

We recognize that the CM Rules require few formalities to initiate a delivery call. But at a minimum, a delivery call must be commenced by the filing of a petition with the Director. No such petition was filed here, and the Director never commenced a contested case. Thus, we hold that there was no adverse claim made.

The Districts make an alternative, but related argument, that the Final Order should be set aside because the Director's Notice and Final Order failed to address the requirements of Idaho Code section 42-237b.–d. Those subsections—which were repealed effective July 1, 2021— allowed a water user who makes an adverse claim "with a written statement under oath" to have that claim heard before a local groundwater board. I.C. § 42-237b.–d. The Districts argue that even though the statute was repealed effective July 1, 2021 (the same day the one-week curtailment went into effect), the Director was required to comply with the statute during the pendency of the administrative proceedings, which began with the Director's Notice on May 4, 2021. Clearly, the Director must comply with all statutes then in effect. But the statute did not apply during the administrative proceedings because the Seniors, as explained above, did not file an adverse claim as a "written statement under oath." Therefore, we hold that the Director complied with Idaho Code section 42-237b.–d. as it existed during the administrative proceedings.

C. **The district court erred in concluding that the Director's Final Order did not comply with the prior appropriation doctrine.**

The primary issue IDWR raises on appeal is whether the Director's Final Order adhered to the prior appropriation doctrine, which governs the use of Idaho's water. Idaho Const. art. XV, § 3; I.C. § 42-106; *Clear Springs v. Spackman*, 150 Idaho 790, 801–04, 252 P.3d 71, 82–85 (2011).

21

The prior appropriation doctrine consists of two core principles, "that the first appropriator in time is the first in right and that water must be placed to a beneficial use." *A&B v. Spackman*, 155 Idaho 640, 650, 315 P.3d 828, 838 (2013).

Along with "first in time, first in right" and "beneficial use," the prior appropriation doctrine encompasses the rights and obligations of the appropriator, including: water appropriation procedures, priority date, point and means of diversion, period of use, place of use, conveyance loss, duty to not waste water, economical and reasonable use, the sale, transfer, or rental of water rights, and the administration and distribution of water rights. *See* Wells A. Hutchins, *The Idaho Law of Water Rights*, 5 Idaho L. Rev. 1, 37–57, 90 (1968).

Before analyzing whether the Director's Final Order complied with the prior appropriation doctrine, the district court considered differences between proceedings instituted under the CM Rules and the Ground Water Act. The district court acknowledged the "obvious" distinction that the CM Rules set forth extensive rules, definitions, procedures, and criteria governing conjunctive administration. For example, the CM Rules set forth the procedures and criteria for determining an area of common groundwater supply (CM Rule 31), for determining material injury and reasonableness of diversions (CM Rule 42), and for evaluating proposed mitigation plans (CM Rule 43).

In contrast, the Ground Water Act provides no comparable rules, definitions, procedures, or criteria to follow. The district court observed that this lack of guidance creates uncertainty about how conjunctive administration is to occur under the Act. Accordingly, the district court concluded that because both conjunctive administration methods must comply with the prior appropriation doctrine, the processes, and the results under each should be substantially similar.

Despite concluding that the Director was not required to apply the CM Rules when conjunctively administering water rights under the Ground Water Act, the district court determined that the rules, definitions, procedures, and criteria set forth in the CM Rules would inform its evaluation of the Director's Final Order. The district court explained:

> Those processes are useful to reference because they have been found to be facially constitutional. *American Falls Reservoir Dist. No. 2* [*v. Idaho Dep't of Water Res.*], 143 Idaho 862, 872-880 154 P.3d 433, 443-451 (2007). Moreover, their purpose and the constitutionality of their application to the facts of various cases have been evaluated by this Court and the Idaho Supreme Court. This judicial evaluation has created a line of precedent clarifying how conjunctive administration is to occur under the prior appropriation doctrine.

While not expressed, the district court's ruling implicitly recognizes that this Court's precedent analyzing the prior appropriation doctrine has largely been framed by cases applying the CM Rules. *See*, *e.g.*, *IGWA. v. Idaho Dep't of Water Res.*, 160 Idaho 119, 130, 369 P.3d 897, 908 (2016) (the Conjunctive Management Rules integrate all elements of the prior appropriation doctrine as established by Idaho law); *AFRD#2*, 143 Idaho 862, 154 P.3d 433 (the SRBA court's issuance of partial decrees did not prevent the Director from considering the material injury factors in the Conjunctive Management Rules during a delivery call). Thus, we have acknowledged the interplay between the prior appropriation doctrine and the Rules. Indeed, the CM Rules state explicitly that the "rules acknowledge *all* elements of the prior appropriation doctrine as established by Idaho law." IDAPA 37.03.11.020.02 (emphasis added).

The district court correctly determined that the definitions in the CM Rules and subsequent case law interpreting them *could* apply to proceedings begun under Idaho Code section 42-237a.g.[5] However, as explained below, we conclude that the district court erred when it ruled that all the procedural requirements identified in the CM Rules are necessary to comply with the prior appropriation doctrine.

1. *The prior appropriation doctrine does not require the designation of an area of common groundwater supply when proceedings have been instituted under the Ground Water Act instead of the CM Rules.*

One of the reasons the district court held that the Director's Final Order violated the prior appropriation doctrine was because it did not establish an area of common groundwater supply. In concluding that establishment of an area of common groundwater supply was a prerequisite to conjunctive administration, the district court relied on the CM definition of common groundwater supply and its decision in *Sun Valley v. Spackman*, No. CV-WA-2015-14500 (Ada Cnty. Dist. Ct. April 22, 2016) ("*Sun Valley*"), which was issued after the Association's 2015 delivery call.

---

[5] We note that the Districts misquoted this Court in *AFRD#2*, writing: "this Court held that the CM Rules <u>incorporate</u> concepts of the prior appropriation doctrine such as: '<u>material injury</u>; reasonableness of the senior water right diversion; whether a senior right can be satisfied using alternate points and/or means of diversion; full economic development; compelling a surface user to convert his point of diversion to a ground water source; and reasonableness of use.'" (Emphasis added in the Brief.) But this Court actually stated that it was "[t]he district court [that] noted that the CM Rules incorporate concepts to be considered in responding to a delivery call, such as: material injury; reasonableness of the senior water right diversion; whether a senior right can be satisfied using alternate points and/or means of diversion; full economic development; compelling a surface user to convert his point of diversion to a ground water source; and reasonableness of use." *AFRD#2*, 143 Idaho at 869–70, 154 P.3d at 440–41. Even so, as discussed above, the CM Rules are undeniably implicated when a delivery call is made. IDAPA 37.03.11.001.

The CM Rules define an area having a common groundwater supply as "[a] ground water source within which the diversion and use of ground water or changes in ground water recharge affect the flow of water in a surface water source." IDAPA 37.03.11.010.01. In *Sun Valley*, the district court addressed the need to establish an area of common groundwater supply for purposes of conjunctive management:

> Determining an area of common ground water supply is critical in a surface to ground water call. Its boundary defines the world of water users whose rights may be affected by the call, and who ultimately need[s] to be given notice and an opportunity to be heard. In the [c]ourt's estimation, determining the applicable area of common ground water supply is the single most important factor relevant to the proper and orderly processing of a call involving the conjunctive [management] of surface and ground water.

*Memorandum Decision and Order*, Ada County Case No. CV-WA-2015-14500, pp. 8–9. The district court there found that senior water users could not seek conjunctive management *under the CM Rules* in Water District 37 without the establishment of an area of common groundwater supply. *Id*. The district court's *Sun Valley* decision was not appealed to this Court.

Facing the same issue here, the district court applied its reasoning from the *Sun Valley* case to the current case, ruling that the designation of an area of common groundwater is a necessary pre-condition to conjunctive management of interconnected ground and surface water rights under the prior appropriation doctrine. Thus, the district court found that the failure to designate an area of common groundwater supply was fatal to the Director's exercise of discretion under the Ground Water Act.

The district court explained that the need to establish an area of common groundwater supply is two-fold. First, an area of common groundwater supply determines the borders for due process—its boundary establishes the world of groundwater right holders who could be subject to curtailment, and it is those water users who must be given proper notice and an opportunity to be heard. Second, with respect to priority administration, a common groundwater supply's boundary establishes the proper order of curtailment of junior rights. In times of shortage, junior water rights are administered based on their priority date to satisfy materially injured senior rights under the prior appropriation doctrine. The district court found that an area of common groundwater supply is necessary to ensure that proper priority administration is accomplished consistently with the prior appropriation doctrine. Since no such area was established, the district court set aside the Director's Final Order.

24

The Districts argue in support of the district court. They maintain that determining an area of common groundwater supply is necessary due to the complex interconnected nature of surface and groundwater. Conjunctive management requires a "good understanding of both the hydrological relationship and legal relationship between ground and surface water rights." *A&B*, 131 Idaho at 422, 958 P.2d at 579. These issues "generally relate to two classic elements of a water right—its source and priority." *Id*. The Districts argue that determining the area of common groundwater supply provides the basis for making those evaluations and is therefore key to determining source and priority to ensure the prior appropriation doctrine is followed. The Districts maintain that an area of common groundwater supply is necessary even in an established water district.

IDWR counters that the district court's concerns are unfounded. As for the first concern, IDWR argues Water District 37 encompasses every surface and groundwater right at issue in this proceeding. Water districts facilitate "the essential governmental function of distribution of water among appropriators under the laws of the state of Idaho." I.C. § 42-604. To that end, the Ground Water Act provides, "whenever it is determined that any area has a ground water supply which affects the flow of water in any stream or streams in an organized water district," the Director "shall also have the power to . . . incorporate such area in said water district." I.C. § 42-237a.g.

IDWR argues the purpose of designating areas of common groundwater supply is to facilitate the incorporation of those areas into water districts. IDWR created Water District 37 several years before this case began, and incorporated groundwater rights, including those in the Bellevue Triangle, into Water District 37 in 2013. IDWR pointed out that the "proper conjunctive administration of surface and ground water rights[,] and the protection of senior priority water rights" were key reasons underpinning its decision to include groundwater rights in the water district. IDWR argues that designating an area of common groundwater supply in this context would be superfluous and hamper timely, in-season relief to injured seniors in this and similar cases.

Because IDWR maintains comprehensive water right records, IDWR argues that the lack of a designation of a common groundwater supply did not prevent IDWR from identifying, notifying, and affording an opportunity to be heard to all potentially affected water right holders in District 37. Indeed, IDWR published notice in three area newspapers and sent individual notices

25

to every holder of surface and groundwater rights in Water District 37, as well as neighboring Water District 37B.

IDWR further argues that the establishment of Water District 37 also resolves the district court's second concern regarding the proper order of curtailment. Adjudicated "priorities of appropriation" are a prerequisite for a water district. *Thompson Creek*, 148 Idaho at 211, 220 P.3d at 329 (citing I.C. § 42-604). The Snake River Basin Adjudication ("SRBA") had decreed or was in the process of decreeing surface and groundwater rights when IDWR incorporated groundwater rights into Water District 37. *See Eden v. State*, 164 Idaho 241, 244, 429 P.3d 129, 132 (2018) (explaining the SRBA Final Unified Decree "would allow for the creation of an accurate schedule of water rights to assure the proper delivery of water in times of shortage"). Rights appropriated after the SRBA are subject to the mandatory water right licensing regime administered by IDWR and incorporated into the district. I.C. § 42-201(1), (7). Thus, IDWR argues the relative priorities of all the rights subject to administration in Water District 37 had already been ascertained and were now matters of public record before this administrative proceeding began.

IDWR's position is well taken and supported by the record. Tim Luke's staff memorandum disclosed IDWR's extensive knowledge of priority administration for both ground and surface water users in Water District 37 before the administrative hearing. His memorandum describes priority-based surface water delivery practices and analyzes possible injury to senior rights. IDWR's knowledge of relative priorities also was integral to Jennifer Sukow's staff memorandum, which summarized the development of groundwater in the Bellevue Triangle, the WRV Aquifer Model, and the Model-based curtailment analyses used in this proceeding. Sukow's memorandum charts the growth in groundwater development relative to water right priority dates, revealing IDWR's knowledge of groundwater right priorities in Water District 37. The Final Order's list of curtailed rights was also drawn from IDWR's records of licensed or decreed groundwater rights in Water District 37.

Once the geographic scope of curtailment was determined through IDWR's modeling and the Director's legal analysis of injury to senior rights, IDWR's records of water rights within Water District 37 ensured that the order of curtailment was proper because it afforded notice to all the parties involved. Thus, there is substantial and competent evidence supporting IDWR's claim that the designation of an area of common groundwater supply is unnecessary to ensure that proper priority administration is accomplished under the facts here.

26

Sun Valley Company posits the law of the case doctrine requires establishment of an area of common groundwater supply in the Big Wood and Little Wood Rivers before curtailment of groundwater rights may take place. The law of the case doctrine "is intended to avoid relitigating issues that have already been decided, and it functions much like *stare decisis*." *Regan v. Owen*, 163 Idaho 359, 362, 41 P.3d 759, 762 (2018). The doctrine prevents relitigating issues decided by a district court acting in its appellate capacity, even when an appeal was not taken to the Supreme Court. *Swanson v. Swanson*, 134 Idaho 512, 515–16, 5 P.3d 973, 976–77 (2000).

Citing the *Sun Valley* district court decision—which likewise included the Director, IDWR, and the Big Wood & Little Wood Water Users Association—Sun Valley Company asserts "[a]ll parties agree that an area of common ground water supply applicable to the Big Wood and Little Wood River must be determined." But here, no party is disputing that an area of common groundwater supply would need to be established *if a delivery call had been filed*. However, no adverse claim was filed, so this case is distinguishable from *Sun Valley v. Spackman*. Therefore, the law of the case doctrine is not implicated.

We agree with IDWR that requiring the Director to establish "an area of common ground water supply" before he is allowed to curtail groundwater pumping ignores the discretionary language in section 42-237a.g. Statutory interpretation "begins with the literal language of the statute" and "must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant." *Melton v. Alt*, 163 Idaho 158, 162–63, 408 P.3d 913, 917–18 (2018) (cleaned up). Applying the plain language of the statute, the Director may, but is not required to, establish an area of common groundwater supply if it will be of assistance:

> To assist the director of the department of water resources in the administration and enforcement of this act, and in making determinations upon which said orders shall be based, he *may establish* a ground water pumping level or levels in an area or areas having a common ground water supply as determined by him as hereinafter provided.

I.C. § 42-237a.g. (emphasis added).

"When used in a statute, the word 'may' is permissive rather than the imperative or mandatory meaning of 'must' or 'shall.'" *Rife v. Long*, 127 Idaho 841, 848, 908 P.2d 143, 150 (1995). Other language in section 42-237a.g. addressing areas of common groundwater supply is just as permissive: "[i]n connection with his supervision and control of the exercise of ground water rights the director of the department of water resources shall also have the power to determine what areas of the state have a common ground water supply . . . ." I.C. § 42-237a.g.

Thus, the statute does not *require* a determination of common groundwater supply. Instead, it unambiguously empowers the Director to make the determination "in his sole discretion." I.C. § 42-237a.

We also note that several cases have analyzed Idaho's prior appropriation doctrine without holding that an area of common groundwater supply is a prerequisite for curtailing junior groundwater pumping. *See*, *e.g.*, *State ex rel. Tappan v. Smith*, 92 Idaho 451, 458, 444 P.2d 412, 420 (1968) (an appeal by groundwater pumpers in which nothing in the opinion required the establishment of an area of common groundwater supply to be a prerequisite for an injunction under Idaho Code section 42-237a.g. and other Ground Water Act provisions); *Baker v. Ore-Ida Foods, Inc.*, 95 Idaho 575, 583-85, 513 P.2d 627, 635-37 (1973) (in a case involving application of section 42-237a.g., we did not hold that an area of common groundwater supply is a prerequisite for curtailing groundwater pumping); *IGWA v. Idaho Dep't of Water Res.*, 160 Idaho 119, 369 P.3d 897 (2016) (noting that the "Director had discretion to implement the trim line based on the policy of beneficial use[ ]" without requiring a determination of a common groundwater supply).

Finally, we hold that designating an area of common groundwater supply was unnecessary because the Director used the best available science to determine whether water was available to fill groundwater rights in the Bellevue Triangle. The Director convened the administrative proceeding under section 42-237a.g. to determine "whether water is available to fill the ground water rights" in a Potential Area of Curtailment "within the Wood River Valley south of Bellevue." The Director identified the Potential Area of Curtailment based on the WRV Aquifer Model's results that "show[ed] curtailment of ground water rights during the 2021 irrigation season would result in increased surface water flows for the holders of senior surface water rights during the 2021 irrigation season." The Director found that the Model "is the best available tool to evaluate the effects of ground water pumping on flows in Silver Creek." Sukow's work supplied the Director with substantial evidence that "Silver Creek and its tributary spring creeks derive their waters from the shallow aquifer underlying the Bellevue Triangle."

Critically, Sukow ruled out every other groundwater supply as sources of water for Silver Creek and its tributaries: "Other aquifers within Basin 37, including the Camas prairie aquifer system and the Eastern Snake Plain Aquifer, do not interact with Silver Creek or the Little Wood River; therefore, water use within the other aquifers does not affect streamflow in Silver Creek or

28

the Little Wood River below Silver Creek." Thus, substantial evidence in the record establishes the Wood River Valley Aquifer is the only groundwater supply relevant to this proceeding.

We conclude that the WRV Aquifer Model, and the extensive body of scientific data and literature supporting it, gave the Director vital insight that allowed him to exercise discretion within the strictures of due process here, as we hold below. The Model was the basis for determining how, when, where, and to what extent the diversion and use of water from the Wood River Valley Aquifer impacts connected surface water flows. IDWR argues that factual understanding—not the formality of establishing an area of common groundwater supply— satisfies the required knowledge for conjunctive administration. We agree. The district court erred in demanding the establishment of a designated area of common groundwater supply when the enabling legislation, the record, and the Final Order all establish the Director employed the appropriate process, had the requisite knowledge, and had the legal authority to proceed without one.

The Districts object to this result, arguing that IDWR's model is not a substitute for establishing an area of common groundwater supply because the Model boundary is limited in scope. It also encompasses portions of the Wood River Valley Aquifer system but does not include the entirety of Water District 37, nor does it cover the entire Big Wood River GWMA. The Districts contend that although the Director could have used the Model as a tool to determine an area of common groundwater supply, he needed to establish those boundaries before junior rights could be curtailed. Sun Valley Company adds that at the judicial review hearing, IDWR's counsel was "unable to explain how the boundaries of the 'potential area of curtailment' were arrived at." Sun Valley Company emphasizes that the boundary of the potential area of curtailment shifted throughout the hearing, providing uncertainty about who was to be provided notice and whose rights would ultimately be curtailed.

The Districts thus argue that conjunctive administration requires IDWR to know "the relative priorities of the ground and surface water rights, how the various ground and surface water sources are interconnected, and how, when, where and to what extent the diversion and use of water from one source impacts the water flows in that source and other sources." (Citing *A&B*, 131 Idaho at 422, 958 P.2d at 579). The Districts submit that the intricacies of conjunctive administration are "precisely the reason for the CM Rules." *AFRD #2*, 143 Idaho at 877, 154 P.3d at 448. The Districts argue that it is significant that CM Rule 10's definition of common

29

groundwater supply cites section 42-237a.g. and contend that this reference confirms that the requirements of the CM Rules and section 42-237a.g. are identical with respect to the requirement of an area of common groundwater supply.

Acknowledging the contrary arguments, we nevertheless hold that requiring the Director to establish an area of common groundwater supply before he is allowed to curtail groundwater pumping would ignore the discretionary authority he holds *to act expeditiously*, as set out in Idaho Code section 42-237a.g. Applying the plain language of the statute, the Director is given discretion to establish an area of common groundwater supply if it will be of assistance. We hold that the Director was not required to establish an area of common groundwater supply before curtailing water rights in a proceeding initiated under the Ground Water Act. The statute implicitly recognizes the need for expedited proceedings when "water to fill any water right in said well is not there available." Idaho Code § 42-237a.g. The need to act promptly in these circumstances, outside the restrictions of the CM Rules, is paramount. Thus, the authority granted the Director is consistent with the purpose behind the statute.

The authorities that the district court relied on (the CM Rules' definition of common groundwater supply and its *Sun Valley* decision) both show how important it is to establish a common groundwater supply, but neither requires it as a prerequisite to curtailing water rights when the CM Rules are not in play. That the Director may, but is not required to, establish an area of common groundwater supply *if it will be of assistance* gives the Director wide discretion to act quickly within the scope and purview of his authority in times of extreme drought like the Wood River valley experienced in the 2021 water year. I.C. § 42-237a.g.

Moreover, we also hold that the Director's determination that designating an area of common groundwater supply would not "assist" him in this instance is supported by "substantial[,] competent evidence in the record." *A&B*, 153 Idaho at 506, 284 P.3d at 231 (an "agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial[,] competent evidence in the record"). Here, the Director concluded that designating an area of common groundwater supply was not needed because the WRV Aquifer Model curtailment runs provided sufficient evidence to determine the availability of water to fill groundwater rights in the Bellevue Triangle. In acting on that evidence the Director did not abuse his discretion.

*2. The prior appropriation doctrine does not require a finding of "material injury" when proceedings have been initiated under the Ground Water Act instead of the CM Rules.*

Relying on our holding in *Clear Springs*, the district court concluded that the Director must make an explicit material injury finding, noting that this Court has recognized water may be deemed unavailable under section 42-237a. to fill a groundwater right in two scenarios:

> [Idaho Code section 42-237a.] merely provides that well water cannot be used to fill a ground water right if doing so would either: (a) *cause material injury to any prior surface or ground water right* or (b) result in withdrawals from the aquifer exceeding recharge.

150 Idaho at 804, 252 P.3d at 85 (emphasis added).

Based on this first scenario, the district court concluded that the Director's authority to curtail delivery of water hinges on his making an explicit finding that the groundwater withdrawal would cause "material injury" to a senior water right. The district court recognized that "material injury" is a term of art that is not used or defined in Idaho Code section 42-237a.g. However, "material injury" is defined by the CM Rules as a "[h]indrance to or impact upon the exercise of a water right caused by the use of water by another person as determined in accordance with Idaho [l]aw, as set forth in Rule 42." IDAPA 37.03.11.010.14. CM Rule 42 provides criteria the Director may consider in determining material injury. IDAPA 37.03.11.042.[6]

Applying this authority, the district court determined that the Director must apply and make a finding under the "material injury" standard regardless of whether the Director conjunctively

---

[6] CM Rule 42 provides these factors that may be considered in determining whether the holders of water rights are suffering from material injury: (a) The amount of water available in the source from which the water right is diverted; (b) The effort or expense of the holder of the water right to divert water from the source; (c) Whether the exercise of junior-priority ground water rights individually or collectively affects the quantity and timing of when water is available to, and the cost of exercising, a senior-priority surface or ground water right. This may include the seasonal as well as the multi-year and cumulative impacts of all ground water withdrawals from the area having a common ground water supply; (d) If for irrigation, the rate of diversion compared to the acreage of land served, the annual volume of water diverted, the system diversion and conveyance efficiency, and the method of irrigation water application; (e) The amount of water being diverted and used compared to the water rights; (f) The existence of water measuring and recording devices; (g) The extent to which the requirements of the holder of a senior-priority water right could be met with the user's existing facilities and water supplies by employing reasonable diversion and conveyance efficiency and conservation practices; provided, however, the holder of a surface water storage right shall be entitled to maintain a reasonable amount of carry-over storage to assure water supplies for future dry years. In determining a reasonable amount of carry-over storage water, the Director shall consider the average annual rate of fill of storage reservoirs and the average annual carry-over for prior comparable water conditions and the projected water supply for the system; (h) The extent to which the requirements of the senior-priority surface water right could be met using alternate reasonable means of diversion or alternate points of diversion, including the construction of wells or the use of existing wells to divert and use water from the area having a common ground water supply under the petitioner's surface water right priority. IDAPA 37.03.11.042.

administers ground and surface water rights under the Ground Water Act or the CM Rules. Because the Final Order had no finding of material injury to senior surface water rights, the district court determined that the order was contrary to law and must be set aside.

We hold that the district court erroneously relied on the CM Rules in setting aside the Director's Final Order. The requirement of a "material injury" finding, as defined in the CM Rules, does not override or limit the Director's statutory authority to initiate proceedings under section 42-237a.g. Further, this Court's reference to "material injury" in *Clear Springs* did not change the statutory curtailment standard in section 42-237a.g. The factual determination that water "in said well is not there available," Idaho Code section 42-237a.g., is substantively the same as what the CM Rules require—though it is defined differently. Having no water available is ipso facto a "material injury," even if the Director did not use those specific words.

In *Clear Springs*, junior groundwater users cited Idaho Code section 42-237a.g. to claim curtailment is precluded so long as well withdrawals do not exceed the rate of natural recharge. *Id*. Explaining that the juniors had "simply misread[] the statute," this Court summarized the statute as providing that well water cannot be used to fill a groundwater right "if doing so would either: (a) cause material injury to any prior surface or ground water right or (b) result in withdrawals from the aquifer exceeding recharge." *Id*. at 804, 252 P.3d at 85. IDWR correctly argues this sentence should not be viewed as a binding construction of the Ground Water Act for three reasons: (1) it conflicts with the plain text of section 42-237a.g.; (2) it is dicta; and (3) *Clear Springs* addressed a delivery call on the Eastern Snake Plain Aquifer ("ESPA") under the CM Rules, making it readily distinguishable from this proceeding in the Bellevue Triangle initiated under the Ground Water Act.

The Districts challenge IDWR's suggestion that the Court's statement in *Clear Springs* is dicta. They maintain the Court's recognition that the "unavailability of well water" would affect senior water rights means "material injury" reflects the statutory language and Idaho's prior appropriation doctrine. Invoking the doctrine of stare decisis, the Districts assert that since "this Court previously interpreted the very statute at issue in this case, and has held that it requires 'material injury' for administration, IDWR is bound to follow that decision." *See, e.g.*, *In re SRBA*, 157 Idaho 385, 393, 336 P.3d 792, 800 (2014). Because we accept IDWR's third argument above, we conclude that *Clear Springs* is not controlling in this case.

In *Clear Springs*, a delivery call had been made; thus, the CM Rules applied. 150 Idaho at 796, 252 P.3d at 77. Accordingly, the obligation to make a material injury finding was required by the CM Rules. As we have explained above, the CM Rules are limited in scope to prescribing the basis and procedure for responding to delivery calls made by the holder of a senior surface or groundwater right against the holder of a junior groundwater right in an area having a common groundwater supply. IDAPA 37.03.11.001. The CM Rules affirmatively require a petitioner to make a claim of material injury in a delivery call petition:

> 01. Delivery Call (Petition). When a delivery call is made by the holder of a surface or ground water right (petitioner) alleging that by reason of diversion of water by the holders of one (1) or more junior-priority ground water rights (respondents) the petitioner is suffering material injury, the petitioner shall file with the Director a petition in writing containing, at least, the following . . .
>
> . . .
>
> > c. All information, measurements, data or study results available to the petitioner to support the claim of material injury.

IDAPA 37.03.11.030.01. There is no such requirement for the Director when he initiates a proceeding under Idaho Code section 42-237a.g.

As a result, this Court's determination in *Clear Springs* requiring a claim of material injury is limited to cases arising under the CM Rules. The *Clear Springs* holding does not apply to proceedings initiated under the Ground Water Act. Though the CM Rules state, "these rules acknowledge all elements of the prior appropriation doctrine as established by Idaho law," IDAPA 37.03.11.020.02, the procedure and information required to file a delivery call does not translate to that requirement being an element of the prior appropriation doctrine.

*Clear Springs* arose from a delivery call among water rights connected to the ESPA, a resource "about 170 miles long and 60 miles wide" that holds "roughly the amount of water contained in Lake Erie." *Clear Springs*, 150 Idaho at 793–94, 252 P.3d at 74–75. To apply the same standard used in evaluating the entire ESPA to the proceeding here, which concerns a localized crisis in a discrete basin, would unnecessarily delay "timely resolution of disputes relating to water" in Groundwater Act settings. Compared to the rights connected to the ESPA, the connection between the Wood River Valley Aquifer system and the springs feeding Silver Creek allows for more immediate relief. As IDWR notes, within the ESPA, it can take *years* for the benefits of curtailment to be realized downstream. Here, by contrast, as the Model projected, and water user testimony established, there was substantial and competent evidence that curtailment

33

of groundwater pumping would yield significant, usable volumes of water for senior appropriators within days. With the pressing need for relief from the 2021 drought, it was both feasible and within his discretion for the Director to use his authority under the Ground Water Act to provide immediate relief to injured seniors. That conclusion satisfies the intent, if not the expansive definition of a "material injury" under the CM Rules.

The Municipal Providers before us caution this Court on the importance of the "material injury" finding. The Municipal Providers argue that if material injury is not a foundational prerequisite for curtailment under the prior appropriation doctrine, IDWR could cut off water users based on its general impression that tightening the screws on juniors might benefit seniors. They argue this approach would permit IDWR to issue curtailments without specific evidence or findings about, for example, the possible futility of the call, actual losses suffered by seniors, reasonableness of the senior water right diversion and use, seniors using water efficiently without waste, full economic development of the groundwater resource, and the absence or forfeiture or partial forfeiture by the seniors.

IDWR counters that these concerns are unfounded given the Director's extensive findings of injury to senior water users here. Injury to a water right is an important element of the prior appropriation doctrine, and it is not an abstract notion. Injury to other water rights must be substantial, that is, "not merely a fanciful injury but a real and actual injury." *Beecher v. Cassia Creek Irr. Co*., 66 Idaho 1, 7, 154 P.2d 507, 513 (1944). Thus, even as we determine that a "material injury" finding is not required under the statute, for the Final Order to comply with the prior appropriation doctrine, the Director must make a factual and legal finding, as he did here, that there was an *actual injury* supporting his decision to "limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available." I.C. § 42-237a.g. This is more than a matter of semantics. It is a matter of recognizing the competing rights at play and the need to establish such injury before curtailing any junior user's groundwater rights.

Here, the Director expressly recognized that the

central legal inquiry in this case is whether withdrawals of ground water from wells in the Bellevue Triangle "would affect, contrary to the declared policy of [the Ground Water Act]," the present use of senior water rights diverting from Silver Creek and the Little Wood River, or their future use during the remainder of the 2021 irrigation season.

34

(Quoting I.C. § 42-237a.g.) The Director's injury analysis then focused on how pumping by junior right holders affected senior rights, not, as the district court concluded, mere "depletions to the source . . . caused by ground water use."

The Seniors contend that based on the record, it is clear that, but for the Director's quick action in this case, the Seniors would have been severely affected in the 2021 crop year, thereby violating the Seniors' water rights. The WRV Aquifer Model showed, and expert witnesses from IDWR and participating parties below agreed, the water system in the Wood River Valley is hydraulically interconnected. The Seniors argue they carried their burden of demonstrating proven and verifiable injuries to them that were, even during the time of the hearing in early June 2021, being caused by the pumping of Juniors. Relying on the language of Idaho Code section 42-237a.g., the Seniors argue they were being affected by unreasonable pumping in the curtailment area that was directly and empirically proven by the modeling as well as expert and lay witnesses from the parties during the hearing.

The Districts disagree, arguing that the undisputed facts show that only three surface water users would have benefited from 100% curtailment for the rest of the 2021 irrigation season. As to the April 1883 rights held by Barbara Farms, Taber, and Ritter, the Districts assert that the Director did not consider or carefully evaluate the actual number of acres irrigated, actual crop water needs, or the availability of other water supplies (i.e., leased storage and supplemental groundwater).

The Districts' focus on alternate sources of water available to the Seniors does not diminish the substantial and competent evidence of injury that would be caused by junior groundwater users. We recognize the argument that a senior water user's effort to rent separate water might mitigate the damage that could occur if the junior rights were not curtailed. However, that evidence simply establishes that the facts below were disputed. We do not resolve factual issues like this on appeal. Our duty is to review the decision of the Director to determine whether substantial, competent evidence supports his decision.

> A reviewing court "defers to the agency's findings of fact unless they are clearly erroneous," and "the agency's factual determinations are binding on the reviewing court, even when there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *A & B Irrigation Dist. v. Idaho Dep't of Water Res.*, 153 Idaho 500, 505–06, 284 P.3d 225, 230–31 (2012). Substantial evidence is "relevant evidence that a reasonable

35

mind might accept to support a conclusion." *In re Idaho Dep't of Water Res. Amended Final Order Creating Water Dist. No. 170*, 148 Idaho 200, 212, 220 P.3d 318, 330 (2009) (quoting *Pearl v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.*, 137 Idaho 107, 112, 44 P.3d 1162, 1167 (2002)).

*N. Snake Ground Water Dist. v. Idaho Dep't of Water Res.*, 160 Idaho 518, 522, 376 P.3d 722, 726 (2016).

Thus, while there is conflicting evidence about the extent of the injury Seniors would suffer if the Director had not curtailed junior groundwater rights, an "agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *A&B*, 153 Idaho at 506. 284 P.3d at 231. Based on these disputed facts, we hold that the injury analysis in the Director's Final Order is supported by substantial and competent evidence.

Accordingly, we conclude that the Director, acting in his discretion, properly employed the powers granted in the Ground Water Act and initiated the administrative proceeding early in the irrigation season. We further hold that the Director was not required to address the material injury criteria identified in the CM Rules because, as the district court recognized, "the [Ground Water] Act provides him separate authority from that found in the CM Rules." The plain language of section 42-237a.g. allows the Director to initiate an administrative hearing when he believes pumping would "affect" either a senior surface or groundwater right. Contrary to the district court's conclusion, we hold that the plain language of the statute does not require the Director to make a finding of "material injury."

*3. The Director's Final Order complied with the prior appropriation doctrine.*

As the 2021 drought began to manifest itself, the Director faced the question of whether water was "available to fill" groundwater rights in the Bellevue Triangle. Under section 42-237a.g., water is not "available to fill" a groundwater right if using that right "would affect, contrary to the declared policy of [the Ground Water Act], the present or future use of any prior surface or ground water right. . . ." I.C. § 42-237a.g. Thus, IDWR advances a statutory test for curtailment comprised of two elements: (1) whether well withdrawals authorized by groundwater rights "would affect" the "present or future use" of any senior water right, and, if so, (2) whether that effect on a senior right is "contrary to the declared policy" of the Ground Water Act. *Id.*

Sun Valley Company argues this test for curtailment is being advanced by IDWR for the first time on appeal; thus, it has not been preserved. Sun Valley Company contends this "test" is

an attempted backdoor around the requirement of material injury to create an area of common groundwater supply. "This Court will not consider issues raised for the first time on appeal." *Alpha Mortg. Fund II v. Drinkard*, 169 Idaho 446, 449–50, 497 P.3d 200, 203–04 (2021) (internal citation omitted). "[P]arties will be held to the theory upon which the case was presented to the lower court." *Id*. Sun Valley Company contends any analysis of IDWR's test would constitute an impermissible, "non-justiciable advisory opinion."

We hold that IDWR presented this argument sufficiently below to preserve it for appeal. IDWR's "test," is simply an analysis of when proceedings can be initiated under Idaho Code section 42-237a.g. according to its plain text. This was clearly the crux of the issue below. This Court has explained that "[a] groomed horse is expected on appeal, but a different horse is forbidden." *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). Whether IDWR presented its argument in this way as a two-prong test or via a broader analysis of the Director's authority below does not affect the substance of IDWR's argument on appeal. The horse remains the same, although it has been groomed. This is still the same argument.

a. The test for curtailment under Idaho Code section 42-237a.g.

Having determined that IDWR's position on the test has been preserved, this Court next considers IDWR's argument that the Director's Final Order satisfied both elements of this test.

*(1) Whether well withdrawals authorized by groundwater rights "would affect" the "present or future use" of any senior water right.*

IDWR argues that the record supports the Director's finding that withdrawal of groundwater "would affect" the "present or future use" of any senior water right. We agree.

Substantial and competent evidence establishes that pumping under junior groundwater rights in the Bellevue Triangle does—and would—adversely affect the present use of senior surface water rights on Silver Creek and the Little Wood River. The aquifer underlying the Bellevue Triangle is the primary source of water for Silver Creek, which in turn sustains the flow of the Little Wood River. The use of water from the aquifer (i.e., groundwater) "affects streamflow in Silver Creek and in the Little Wood River downstream of Silver Creek." The WRV Aquifer Model projected that curtailing pumping in the Bellevue Triangle would deliver "significant" additional flow to Silver Creek in a matter of days. The watermaster and local water users corroborated this projection. Moreover, the Director found that the severe shortage of water in 2021 would probably cause "significant economic injury" to multiple Seniors on Silver Creek and the Little Wood River. The Director's findings on the physical and economic effects of

groundwater pumping in the Bellevue Triangle—which we previously explained are similar to a material injury finding—are supported by substantial and competent evidence in the record that allowing pumping to continue during the worsening 2021 drought would adversely affect the use of senior right holders.

> (2) *Whether that effect on a senior right is "contrary to the declared policy" of the Ground Water Act.*

Second, IDWR argues it contradicts the declared policy of the Ground Water Act for 1880s-era surface rights to be curtailed early in the irrigation season while pumping groundwater under decades-junior rights continues unabated. To determine the relevant policies of the Act, the Director looked to Idaho Code section 42-226, which affirms that Idaho's water resources are "to be devoted to beneficial use in reasonable amounts through appropriation" and that "the doctrine of first in time is first in right is recognized." These "two bedrock principles—that the first appropriator in time is the first in right and that water must be placed to a beneficial use"—derive from the Idaho Constitution. *A&B Irr. Dist.,* 155 Idaho at 650, 315 P.3d at 838 (citing Idaho Const. art. XV, § 3).

The record establishes that ground and surface water users alike were making beneficial use of reasonable amounts of water under valid appropriations. No party to this appeal disputes this. Thus, the Director concluded there was no violation of the beneficial use policy when entering his final order. He also found there was an undeniable violation of "first in time is first in right"—groundwater pumping under junior rights went on while interconnected senior surface rights could not be fulfilled in May and June. This finding is supported by substantial and competent evidence. Thus, both elements of the curtailment test are satisfied, and the Director could limit or prohibit the withdrawal of groundwater from wells in the Bellevue Triangle.

### b.  Idaho's prior appropriation doctrine.

Even though the Director considered the curtailment test identified in the Ground Water Act to be satisfied, it would have been erroneous for the Director to ignore whether curtailment was appropriate under the well-established presumptions, burdens, and evidentiary standards of Idaho's prior appropriation doctrine. Water rights administration starts with the "presumption under Idaho law . . . that the senior is entitled to his decreed water right," which precludes the Director from "forc[ing] the senior to demonstrate an entitlement to the water in the first place[.]" *AFRD #2*, 143 Idaho at 878, 154 P.3d at 449.

The Director determined that water users on Silver Creek and the Little Wood River were diverting water under valid, senior water rights and that groundwater withdrawals under junior rights were adversely affecting the use of water under those senior rights, contrary to the "rule that 'first in time is first in right.'" Much of the evidence supporting these findings was introduced by the Seniors, who therefore carried their minimal burden of supporting an initial determination of injury to their rights. *See AFRD #2*, 143 Idaho at 873, 154 P.3d at 444 (explaining it is permissible to require a senior to provide information that will "assist the Director in his fact-finding").

Once an initial showing of injury to a senior right has been made, junior appropriators have the burden of disproving injury or proving some other defense to curtailment. *AFRD #2*, 143 Idaho at 878, 154 P.3d at 449. This Court has held a junior's defense must be proved by "clear and convincing evidence," meaning "evidence indicating that the thing to be proved is highly probable or reasonably certain." *A&B Irr. Dist.*, 153 Idaho at 516, 284 P.3d at 241.

Sun Valley Company disputes IDWR's reliance on this precedent because it comes from a decision in which this Court was interpreting the CM Rules. Sun Valley argues IDWR cannot have it both ways, arguing for a "clear and convincing evidence" standard based on decisions involving the CM Rules, yet claiming the district court erred when it required establishment of an area of common groundwater supply and a finding of material injury consistent with the CM Rules. Sun Valley submits that, if the Court finds the proceeding does not implicate the CM Rules, the evidentiary standard is an open question that should be litigated on the merits with a fully developed record. *Intermountain Health Care, Inc. v. Bd. of County Comm'rs of Blaine Cnty.*, 107 Idaho 248, 251, 688 P.2d 260, 263 (Ct. App. 1984), *rev'd on other grounds* 109 Idaho 299, 707 P.2d 410 (1985) (preponderance of the evidence applies in administrative hearings).

Given the rights at play, and the precedent that a senior water rights holder is not required "to re-prove an adjudicated right," *AFRD#2*, 143 Idaho at 878, 154 P.3d at 449, we hold that the clear and convincing evidence standard applies to the junior right holder's burden, whether in cases under the CM Rules or in cases brought by the Director under section 42-237a.g. Implementing that standard, the Director's Final Order thoroughly applied relevant precedent to the groundwater appropriators' various defenses. For example, the Final Order explained that the Districts had failed to present clear and convincing evidence that their members' pumping did not injure senior surface water rights. The Final Order also included a detailed analysis of the Districts' futile call

defense.[7] The Director concluded that curtailment of consumptive groundwater pumping in the Bellevue Triangle would not be futile because curtailment would "help minimize surface water users' crop and revenue losses, by preventing curtailment of some surface water rights and allowing some surface water rights that have been curtailed to come back on sooner than would otherwise have been the case."

The Director's analysis establishes that the Districts had the opportunity, but failed to show by clear and convincing evidence that curtailment would not yield an adequate quantity of water for at least some of the senior surface water users to apply water to a beneficial use. *See Sylte*, 165 Idaho at 245, 443 P.3d at 259. The Director's analysis complies with the evidentiary burdens and standards of proof this Court has long relied on to resolve competing claims to interconnected sources. *E.g.*, *A&B Irr. Dist.*, 153 Idaho at 518–20, 284 P.3d at 243–45 (collecting Idaho cases from 1904 to 1964).

The Final Order also complied with the "beneficial use" policy declared in Idaho Code section 42-226, by limiting the geographic scope of curtailment to the Bellevue Triangle. *See IGWA*, 160 Idaho at 132, 369 P.3d at 910 (holding that limiting a curtailment area accords with the "policy of beneficial use"). Both junior and senior water right users were putting their available allocations of water to beneficial use. The Final Order compared the WRV Aquifer Model results for two curtailment simulations—one encompassing the entire Model boundary and the second focused on the Bellevue Triangle. Both simulations predicted that curtailment would yield significant quantities of water to Silver Creek during the 2021 irrigation season. But compared to the first simulation, the second achieved 99% of the predicted in-season benefit to Silver Creek while curtailing 30% less consumptive groundwater use. Thus, 30% of the consumptive groundwater use within the Model's boundary was not curtailed because, as the Director found, "it has minimal impact on Silver Creek."

---

[7] Generally, the futile call doctrine provides:

> [I]f [due to] seepage, evaporation, channel absorption or other conditions beyond the control of the appropriators the water in the stream will not reach the point of the prior appropriator in sufficient quantity for him to apply it to beneficial use, then a junior appropriator whose diversion point is higher on the stream may divert the water.

*Sylte v. IDWR*, 165 Idaho 238, 245, 443 P.3d 252, 259 (2019) (quoting *Gilbert v. Smith,* 97 Idaho 735, 739, 552 P.2d 1220, 1224 (1976)).

At its core, the prior appropriation doctrine "contemplates a balance between the 'bedrock principles' of priority of right and beneficial use." *IGWA*, 160 Idaho at 132, 369 P.3d at 910 (quoting *In re A&B*, 155 Idaho at 650, 315 P.3d at 838). This case exemplifies how difficult it can be to strike that balance when water is especially scarce, and why it is necessary to preserve the Director's discretion to perform that balancing subject to the limitations of Idaho law. We hold that the Director, mindful of those limitations, did not err when he concluded the balance here favored protecting senior appropriators' first rights to a drought-limited supply.

The Seniors argue that, from the evidence produced at the hearing in 2021 and the extreme drought, it became readily apparent that pumping was depleting the surface flows in the interconnected system and that curtailment was reasonably necessary to carry out the mandates of the Act. This determination was based on evidence, computer modeling, and expert witness testimony, all of which were presented at the six-day hearing and incorporated into the Director's Final Order. The Seniors propose that there is no way the Director could have come to a different conclusion and protected the rights of the Seniors. We agree. Simply put, the Juniors continued irrigating while the Seniors were faced with shortfalls. The Director analyzed this and responded with the authority granted by Idaho Code section 42-237a.g. As a result, we reverse the district court's determination that the Director's Final Order failed to comply with the prior appropriation doctrine.

### D. Due process concerns.

The Districts make two due process arguments. First, the Districts argue that the Director violated their right to due process by not adhering to the requirements of the prior appropriation doctrine for conjunctive administration within Water District 37. Second, the Districts allege that the Director's decision to deny the Districts' proposed mitigation plan without a hearing and immediately curtail over 300 groundwater rights that were providing irrigation water to about 23,000 acres during the peak of irrigation season was erroneous.

#### 1. The proceedings initiated by the Director under Idaho Code section 42-237a.g. satisfied due process.

The district court concluded that the Districts' due process concerns about the hearing process "dovetailed" with the issues related to the Director's failure to designate an area of common groundwater supply and perform a material injury evaluation. The district court declined to address any remaining due process issues.

41

Procedural due process requires that there be some process to ensure that an individual is not arbitrarily deprived of his rights in violation of the state or federal constitutions. *See Union Bank, N.A. v. JV LLC*, 163 Idaho 306, 317, 413 P.3d 407, 418 (2017). Determining whether an individual's due process rights have been violated requires this Court to engage in a two-step analysis. *Guzman v. Piercy*, 155 Idaho 928, 939, 318 P.3d 918, 929 (2014) (citing *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 72–73, 28 P.3d 1006, 1015–16 (2001)).

For the first step, we must decide whether an individual's threatened interest is a liberty or property interest under the Fourteenth Amendment. *Id*. In the second step, we "determine[ ] what process is due." *Id*. Water rights are real property rights that require due process, so the first step is met. *See* I.C. § 55-101; *In re Water District No. 170*, 148 Idaho 200, 220 P.3d 318 (2009); *Clear Springs*, 150 Idaho at 814, 252 P.3d at 95 (water rights "must be afforded the protection of due process of law before they may be taken by the state").

The Districts claim that by initiating conjunctive administration of hundreds of surface and groundwater rights in Water District 37 through a truncated hearing process, the Director violated any notion of fundamental fairness and failed to provide the "opportunity to be heard in a meaningful time and in a meaningful manner." (Citing *Ayala v. Robert J. Meyers Farms, Inc.*, 165 Idaho 335, 362, 445 P.3d 164, 171 (2019)). IDWR responds that the administrative proceeding initiated by the Director, as outlined by statute, afforded the Districts the process they were due, particularly given that all affected parties received notice and an opportunity to be heard at the Director's six-day hearing before any curtailment occurred.

"A water user has no property interest in being free from the State's regulation of water distribution in accordance with the prior appropriation doctrine. . . ." *Thompson Creek*, 148 Idaho at 213–14, 220 P.3d at 331–32. Because the "water itself is the property of the state" and IDWR has "constitutionally based" authority to regulate water rights in times of scarcity, this Court has not mandated rigid curtailment procedures. *Nettleton v. Higginson*, 98 Idaho 87, 90–91, 558 P.2d 1048, 1051–52 (1977). On the contrary, "the determination of what due process is required" for a particular curtailment "requires a balancing of both the nature of the governmental function involved and the private interests affected." *Id*. at 90, 558 P.2d at 1051. Three factors guide this balancing test:

> (1) the importance of the private interest at stake; (2) the risk of an erroneous deprivation of rights given the processes at hand and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's

interest, 'including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'

*Lu Ranching Co. v. United States*, 138 Idaho 606, 608, 67 P.3d 85, 87 (2003) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). We will list our analysis of each factor, and then weigh them all in summation.

### a. The private interests at stake.

The Districts contend that by the time the hearing process was initiated, the Districts were past planting and well into the irrigation season. As a result, the risk of deprivation was inherently high, as District members stood to lose upwards of 12 million dollars from contracts and lost crops that had been planted in anticipation of the 2021 irrigation season.

IDWR counters that both Seniors and Juniors had their property rights affected by the proceeding, which the Director had a duty to "equally guard." Like the Districts' members, IDWR emphasizes that Seniors also faced curtailment with crops in the ground. Further, those Seniors who could access and afford supplemental water were being forced to bear the cost of renting or pumping it, as formerly dependable surface rights were proving unreliable. IDWR clarifies that while these facts do not diminish the Districts' members' interests in uninterrupted water supplies, they do show those interests were neither exclusive nor uniquely vulnerable during the 2021 drought.

During the 2021 drought, scarcity was a fact of life for all water users in the Wood River Valley. "The right to water is a permanent concern to farmers, ranchers and other users," whether junior or senior. *Lu Ranching*, 138 Idaho at 608, 67 P.3d at 87. Because water shortages are an ever-present concern, the Seniors claim the junior-priority groundwater pumpers had ample opportunity to prepare for curtailment, even prior to the planting for the 2021 season. Furthermore, the risk of curtailment of a junior-priority groundwater right during a time of shortage is a risk that Idaho water users knowingly undertake and for which they should always plan, as senior surface water users must also do. We conclude that both Senior and Junior water users had significant private interests at stake, and that given the balance of risk among all water users, those with junior rights were the party fittingly most affected by a curtailment determination.

### b. The risk of an erroneous deprivation of rights.

The focus of the Districts' due process argument is the short duration of the proceedings. The Districts allege that the Director was aware of poor water conditions in the basin as early as January and had instructed his staff to start working on technical analyses for administration in

43

March, yet the Director nevertheless provided no notice of a section 42-237a.g. curtailment proceeding until May 4, 2021. Later, the Districts aver that they had not been provided adequate time to evaluate and review information critical to their ability to prepare and present defenses to the delivery calls and "material injury" determinations that the Director proposed to decide at the hearing.

Upon receipt of the staff memoranda, there were several reports and extensive data and information to compile and review. The Districts argue that forcing those parties subject to curtailment to absorb this information (without knowing how exhaustive the information was) and then come prepared to a hearing to debate and review this highly technical information, in two and a half weeks, was highly prejudicial and violated due process. *See State v. Doe*, 147 Idaho 542, 546, 211 P.3d 787, 791 (2009) ("notice must be provided at a time which allows the person to reasonably be prepared to address the issue"). Sun Valley Company adds that due to the truncated nature of the proceedings, its expert did not receive information he had requested from IDWR until the hearing was underway, which prevented him from properly analyzing assertions made by IDWR and senior water users.

IDWR disputes the Districts' claim that if they had had more time for discovery, they could have raised a more viable defense. First, IDWR emphasizes that the Districts' experts, with years of experience working in the Wood River Valley, admitted that the Model, created over a period of roughly eight years, was "the best tool we have . . . warts and all." Lay witnesses also testified at length and were subject to cross-examination. Beyond testimony, the Districts offered, and the Director admitted, over 25 exhibits exceeding 450 pages. The Districts also submitted a 48-page post-hearing brief. Based on this, IDWR argues there was no shortage of meaningful opportunities for the Districts to be heard.

Still, the Districts urge this Court to conclude they were deprived of due process after carefully considering the context and timing of this proceeding, particularly considering reasonable schedules and fact gathering required for such a conjunctive administration case. While a single application for a permit and transfer cases can routinely take several months, a complex conjunctive administration matter involving hundreds of water rights, multiple aquifer levels, and surface water sources deserves adequate time for the analysis that was required for a "fair" process. IDWR counters that in a deep drought with irrigation water at stake, the potential damage from a delay cannot be ignored.

44

The drafters of Idaho's Constitution "intended that there be no unnecessary delays in the delivery of water pursuant to a valid water right." *AFRD #2*, 143 Idaho at 874, 154 P.3d at 445. IDWR argues the situation could have warranted a curtail-now-hearing-later approach, which this Court has permitted in appropriate cases. *See Nettleton*, 98 Idaho at 92–93, 558 P.2d at 1053–54; *Clear Springs*, 150 Idaho at 814, 252 P.3d at 95 (recognizing "there are circumstances that justify postponing notice and an opportunity for a hearing" on curtailment). Instead, the Director opted for a pre-curtailment process complete with advance notice, a full panoply of pre- and post-hearing procedures, and a six-day hearing.

"Due process is not a concept rigidly applied to every adversarial confrontation, but instead is a flexible concept calling for such procedural protections as are warranted by the situation." *Halvorson v. N. Latah Cnty. Highway Dist.*, 151 Idaho 196, 204, 254 P.3d 497, 505 (2011) (citing *Paul v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.,* 134 Idaho 838, 843, 11 P.3d 34, 39 (2000)). *See also In re SRBA Case No. 39576 Subcase No. 37-00864*, 164 Idaho 241, 251, 429 P.3d 129, 139 (2018) (quoting *Aberdeen-Springfield Canal Co. v. Peiper*, 133 Idaho 82, 91, 982 P.2d 917, 926 (1999) (due process "is a flexible concept calling for such procedural protections as are warranted by the particular situation")).Time was of the essence and in-season administration of these water rights was warranted—curtailing out-of-priority water use *after the irrigation season had passed* would have been too little, too late. "The presumption under Idaho law is that the senior is entitled to his decreed water right," whether that senior joined the proceeding or not. *AFRD #2*, 143 Idaho at 878, 154 P.3d at 449. That presumption has no practical value if it does not operate to the seniors' benefit *during* an extreme drought. The probable value to the Districts of additional discovery was uncertain at best. But the consequences of delaying administration were clear to the Director: out-of-priority pumping would continue, and "water in usable quantities for at least some of the senior surface water users" would go undelivered. This was simply not a risk that should be foisted on the Seniors here through additional, typical procedural avenues.

## c. The government interest.

In resolving due process challenges to water right administration, this Court has consistently emphasized the State's interest in, and the Director's duty to administer, the State's water. "It is well-settled that the water itself is the property of the state, which has the duty to supervise the allotment of those waters with minimal waste to the private appropriators." *Nettleton*, 98 Idaho at 90, 558 P.2d at 1051. The "state's authority to regulate the distribution of water is

constitutionally based" and "the entire water distribution system under Title 42 of the Idaho Code is to further the state policy of securing the maximum use and benefit of its water resources." *Id.* at 90–91, 558 P.2d at 1051–52. "Just apportionment to, and economical use by, those who have been appropriated water for a beneficial use furthers the important governmental interest of securing the maximum use and benefit of Idaho's scarce water resources." *Clear Springs*, 150 Idaho at 815, 252 P.3d at 96 (citing *Nettleton*, 98 Idaho at 91, 558 P.2d at 1052).

The legislature has likewise declared that distributing water among appropriators in a water district is an "essential governmental function." I.C. § 42-604. To serve that function, the legislature granted the "clear and executive duty" to administer water in a water district to the Director. *Musser*, 125 Idaho at 395, 871 P.2d at 812 (citing I.C. § 42-602). The legislature also granted the Director "sole discretion" to "supervise and control the exercise and administration of all rights to the use of ground waters," including the "discretionary power" the Director used in this case. I.C. § 42-237a.g. These powers and duties would be hollow if, in times of drought, in-season administration of interconnected surface and groundwater rights must wait for protracted litigation before any curtailment occurs. The irrigation season is too short for that—especially in times of extreme drought. Accordingly, the third factor does not suggest a due process violation.

d. <u>Weighing each of these factors.</u>

Weighing the three due process factors together, we hold that IDWR did not violate the Districts' due process rights. Under the first factor (the private interests at stake), the junior rights holders were appropriately curtailed as a result of water management in times of drought. Under the second factor (risk of erroneous deprivation), the procedure provided to the parties below was necessarily expedited, but within reasonable limits in light of the imminent loss to senior right holders. Under the third factor (the government interest), the Director's obligation to administer water rights is an essential government function. None of the three factors indicate that a due process violation occurred here. Therefore, we hold that the Districts' due process concerns fail, given the process they were afforded and the urgent nature of this case.

2. *The Districts' argument that the Director wrongly denied their proposed mitigation plan has not been preserved for appeal.*

The Districts separately argue that the Director wrongly denied the Districts' mitigation plan and implemented curtailment in favor of non-party seniors without a hearing. IDWR maintains that the Director's order rejecting the Districts' first mitigation plan is not properly before the Court; thus, it is outside this Court's jurisdiction. The Districts ask this Court to reject

IDWR's argument because the Director's order illuminates the fact that he acted without a hearing and confirms the erroneous injury standard the Director used to order curtailment in the first place.

The Director denied the Districts' mitigation plan without holding a hearing on June 29, 2021. The Districts filed their initial petition for judicial review on May 24, 2021, which was plainly premature to challenge the Director's June 29 order. The Districts filed their first amended petition for judicial review on June 30, 2021, but that amended petition did not challenge the June 29 order.

While the Districts' first amended petition (that did not challenge the June 29 order) was proceeding in the district court, the 28-day window[8] in which to file a petition for judicial review of the June 29 order closed.

In its order resolving the Districts' first amended petition for judicial review, the district court did not address the Districts' challenge to the Director's June 29 order because the Districts failed to challenge the Director's order in a timely petition for judicial review.

Even so, the Districts now contend the order denying the mitigation plan is properly before this Court on appeal because: (1) the mitigation denial order was included in the supporting materials filed with the district court on June 30, 2021; (2) the first amended petition specifically objected to the Director's disregard for the CM Rules, of which the mitigation plan and its hearing process are a part; and (3) the first amended petition also sought judicial review of the Director's failure to provide adequate due process procedures.

Judicial review of an agency's final order in a contested case can be had only if an aggrieved party "complies with the requirements of sections 67-5271 through 67-5279, Idaho Code." I.C. § 67-5270(3). One of the basic requirements is identification of the order being challenged in a timely petition for judicial review. I.C. § 67-5273(2). "Idaho Code § 67-5273(2) confines the courts' jurisdiction to those petitions filed within the prescribed time period." *City of Eagle v. IDWR*, 150 Idaho 449, 454, 247 P.3d 1037, 1042 (2011). Failure to timely challenge a final order "is jurisdictional," barring review of that order entirely. *Id.*

On appeal from a district court's review of an agency action, this Court reviews the district court's decision to determine whether the issues were correctly decided. *A & B Irr. Dist.*, 155 Idaho

---

[8] Idaho Code section 67-5273 provides that "[a] petition for judicial review of a final order . . . must be filed within twenty-eight (28) days of the service date of the final order."

at 648, 315 P.3d at 836 (citing *Wright v. Bd. of Psych. Examiners*, 148 Idaho 542, 544–45, 224 P.3d 1131, 1133–34 (2010)). Although the parties may have raised many issues during the administrative proceedings on the first amended petition, this Court will only consider those issues actually raised before the district court. *Id.* (citing *Marcia T. Turner, L.L.C. v. City of Twin Falls*, 144 Idaho 203, 208, 159 P.3d 840, 845 (2007)).

The Districts did not raise any specific arguments related to the mitigation plan to the district court. As a result, the Districts' arguments over the mitigation plan were not preserved for appeal.

### E. No parties are entitled to attorney fees on appeal.

The Districts, the City of Hailey, and Sun Valley Company request attorney fees on appeal under Idaho Code section 12-117. Idaho Code section 12-117 provides that "the court hearing the proceeding, including on appeal, shall award the prevailing party reasonable attorney's fees, witness fees and other reasonable expenses, if it finds that the nonprevailing party acted without a reasonable basis in fact or law." None of the parties requesting attorney fees prevailed in this action. Therefore, we decline to award attorney fees as requested. As the prevailing party, we award costs to IDWR under I.A.R. 40(a).

## V.  CONCLUSION

For the reasons set forth above, we hold: (1) the Director was permitted to initiate proceedings under Idaho Code section 42-237a.g.; (2) the CM Rules do not apply to proceedings instituted under Idaho Code section 42-237a.g.; (3) the district court erred in concluding that the Director's Final Order violated the prior appropriation doctrine; and (4) the Districts were afforded the process they were due. Therefore, we affirm the district court's decision on issues (1) and (2). We reverse the district court's decision regarding issues (3) and (4). No attorney fees are awarded on appeal. Costs are awarded to IDWR.

JUSTICES BRODY, STEGNER, MOELLER, and ZAHN CONCUR.

48